Joseph E. VOGLER, and Alaskan
Independence Party, Appellants,

v.

Terry MILLER, Lieutenant Governor of
the State of Alaska, Appellee.

No. 6959.

Supreme Court of Alaska.

Sept. 16, 1982.

Joseph W. Sheehan, Fairbanks, for appellants.

David T. LeBlond, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C. J., and RABINOW-ITZ, CONNOR, MATTHEWS and COMPTON, JJ.

OPINION

MATTHEWS, Justice.

In this case the gubernatorial candidate of a small political party challenges several statutes that restrict access to the ballot on the grounds that they contravene the free speech and equal protection provisions of the Alaska Constitution.

FACTS AND PROCEEDINGS

Joseph Vogler, the gubernatorial candidate of the Alaskan Independence Party (hereinafter AIP), and the AIP itself, sought declaratory and injunctive relief from a decision by the Lieutenant Governor's Office, Division of Elections, to deny Vogler's application for a place on the ballot for the August 1982 primary election and the November, 1982 general election.

The AIP has placed candidates on the ballot in the past. It was formed in 1973, and it successfully placed candidates on the ballot for both the 1974 and 1978 gubernatorial elections. However, at the time of those elections, access to the ballot was more open. Under the old statutes, it was possible for independents and candidates of small parties to secure a place on the ballot by submitting petitions carrying the signatures of 1000 registered voters. In 1980, the legislature changed the signature requirement found in AS 15.25.160 from 1000 signatures to 3% of the vote cast at the last election. For the November 1982 election, the 3% requirement calls for 4,880 signatures, nearly a five-fold increase over the old requirement.[1] The filing deadline for

such a petition remained June 1, nearly 3 months before the primary and 5 months before the general election. AS 15.25.150.

The only other route open to a would-be candidate, aside from a write-in campaign, is to belong to a "political party," which is defined in AS 15.60.010(20) as a political group which polled 10% or more of the vote at the preceding gubernatorial election. AS 15.25.030 provides that a member of such a "political party" need only file a declaration of candidacy and pay a $100.00 fee in order to appear on the primary ballot.

Although the AIP had never polled more than 4.8% of the vote, Vogler submitted a declaration of candidacy along with the fee under this second route because he thought that he would be unable to procure the necessary signatures to proceed by petition. The Lieutenant Governor's Office, Division of Elections, rejected his application, and Vogler filed suit for declaratory and injunctive relief. The suit challenged both the definition of a political party as a group which had polled 10% and the new 3% petition requirement. After a trial, the superior court rejected Vogler's arguments that the 10% definitional requirement and the 3% petition requirement were invalid under the free speech and equal protection clauses of the Alaska Constitution. The court did, however, overturn a requirement that individuals signing a nominating petition declare their intention to vote for that candidate. AS 15.60.010(20). The state has not appealed that ruling.[2]

I. STANDARD OF REVIEW

Vogler's challenges to the ballot restrictions are based upon the free speech provision of the Alaska Constitution, Article I, section 5,[3] and the equal protection provi-

1. According to Vogler, the actual number of signatures now required is closer to 10,000 since there is always a certain number of invalid signatures among those collected. Vogler submitted evidence estimating the cost to obtain signatures at $1.00 per signature.

In 1974, the AIP candidate polled 4,770 votes, representing 4.8% of the votes cast. In 1978, the figure was 2,463 which was 1.9% of the total vote.

2. While the time available for a petition drive under AS 15.25.160 had not yet expired at the time of the superior court's ruling, Vogler chose not to pursue this course.

3. Alaska Const. Art. I, § 5 provides that:

Freedom of Speech. Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

sion, Article I, section 1.[4] Vogler has not raised federal constitutional challenges, presumably because the United States Supreme Court has upheld statutes more restrictive than those he challenges here. *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). Unless the provisions of the Alaska Constitution offer broader protection than their federal counterparts, the statutes must stand.

■ Our previous decisions have found the free speech guarantee of Article I, Section 5 to be at least as broad as that of the First Amendment of the United States Constitution. *Mickens v. City of Kodiak,* 640 P.2d 818, 820 (Alaska 1982); *Messerli v. State,* 626 P.2d 81, 83 (Alaska 1980). The equal protection provision of Article I, section 1 has in some instances been interpreted more broadly than its federal counterpart. *Williams v. Zobel,* 619 P.2d 422, 427 (Alaska 1980); *CFEC v. Apokedak,* 606 P.2d 1255 (Alaska 1980); *State v. Erickson,* 574 P.2d 1, 11 (Alaska 1978). Since there are no Alaskan cases on ballot access much of our analysis deals with cases applying the federal standard. However, we are not necessarily limited by those precedents in interpreting Alaska's constitution. *Breese v. Smith,* 501 P.2d 159, 167 (Alaska 1972).

■ We first examine the nature of the rights involved. Restrictions on ballot access impinge not only on the rights of the potential candidates, but on those of the voters as well. As Justice Black stated in *Williams v. Rhodes,* laws restricting ballot access

place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.

393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968). Both the right to vote and the right to associate freely in pursuit of political beliefs are fundamental.

No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights even the most basic, are illusory if the right to vote is undermined.

*Williams v. Rhodes,* 393 U.S. at 31, 89 S.Ct. at 10, 21 L.Ed.2d at 31, *quoting Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 491 (1964). As Justice Black noted in *Williams:*

Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.

393 U.S. at 32, 89 S.Ct. at 11, 21 L.Ed.2d at 32.

■ It is well accepted that in ballot access cases, the state must show a compelling interest in order to justify infringements of these rights. *See, e.g., Storer v. Brown,* 415 U.S. 724, 729, 94 S.Ct. 1274, 1278, 39 L.Ed.2d 714, 723 (1974); *American Party of Texas v. White,* 415 U.S. 767, 780, 94 S.Ct. 1296, 1305, 39 L.Ed.2d 744, 760 (1974); *Williams v. Rhodes,* 393 U.S. at 31, 89 S.Ct. at 10, 21 L.Ed.2d at 32. That standard is also appropriate under Article I, Section 5 of the Alaska Constitution. *Messerli v. State,* 626 P.2d 81, 84 (Alaska 1980). *See Mickens v. City of Kodiak,* 640 P.2d 818, 821 (Alaska 1982). It is the state's burden to prove that such a compelling interest exists. *Mickens v. City of Kodiak,* 640 P.2d at 822; *Messerli v. State,* 626 P.2d at 84.

4. Alaska Const.Art. I, § 1 provides that:

*Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

## II. AS 15.25.160—THE 3% REQUIREMENT

AS 15.25.160 provides that:

*Required number of signatures for statewide office.* Petitions for the nomination of candidates for the office of governor, lieutenant governor, United States senator and United States representative shall be signed by qualified voters of the state equal in number to at least three percent of the number of votes cast in the preceding general election. Candidates for the office of governor and lieutenant governor shall file jointly.

The state has asserted a number of justifications for the amendment to AS 15.25.-160. The primary justification claimed by the state at oral argument was the desire to make the petition requirements for various public offices uniform. The state points out that at the same time that AS 15.25.160 was amended, the requirements for access to Congressional and State Legislative ballots were amended as well.[5] The state introduced evidence at trial that the legislature's intent was to make all access requirements uniform with those for the Presidential ballot, which already stood at 3%.[6] The state also introduced evidence that the leg-

islature switched to a percentage from a flat figure because it did not wish to amend the statute every few years as the state's population increased. Finally, the state claims that the Legislature intended to eliminate any confusion among voters that might result from having a large number of candidates present on the ballot.[7] The state concedes, however, that no such confusion existed in past Alaskan elections. Such a legislative concern, if it existed, was prospective.

These are all legitimate concerns. The federal cases uniformly accept a state interest in restricting the ballot to those able to muster a "significant modicum of support." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554, 562 (1971); *Lubin v. Panish,* 415 U.S. 709, 718, 94 S.Ct. 1315, 1321, 39 L.Ed.2d 702, 710 (1974); *American Party of Texas v. White,* 415 U.S. 767, 789, 94 S.Ct. 1296, 1310, 39 L.Ed.2d 744, 764 (1974). We agree with that view. Expressing a required showing of support in terms of a proportion of the state's voting population is also acceptable, and in fact, will often better reflect a level of support than will a flat figure.[8] Finally, as noted by the Supreme Court:

---

**5.** The only legislative history available for the amendments is a report submitted to the Legislature by the Election Review Committee appointed by Lieutenant Governor Miller following the 1978 election. The relevant sections of that report are reproduced at 1 Senate Journal Supp. 8, pp. 19–20 (1980). The state introduced that report and the testimony of Patty Ann Polley, the Director of the Division of Elections, to establish the legislative goals underlying the amendments.

**6.** Except for AS 15.30.025, all of the following statutes were amended to require signatures equal to 3% of the votes cast in the preceding general election:

AS 15.30.025 (President of the United States) no change.

AS 15.40.100 (United States Senate) previously required 1000 signatures.

AS 15.40.190 (United States House of Representatives) previously required 1000 signatures.

AS 15.40.440 (Alaska State Senate and State House of Representatives) previously required 5% of the votes cast in the preceding general election.

**7.** Counsel for the state also claimed that there is a valid state interest in protecting the two party system and in seeing that public officials are elected by a majority of the voters. *See Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92, 101 (1972). The state evidently does not claim that that was an actual motivation for the 1980 amendments. *See Smith v. State Executive Comm. of Democratic Party of Ga.,* 288 F.Supp. 371, 374–75 (N.D.Ga. 1968).

**8.** We note that because of Alaska's relatively small population, the actual number of signatures required by laws that have been upheld in other cases is far in excess of even the 4,880 required under the current law. *See, e.g., Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (325,000); *American Party of Texas v. White,* 415 U.S. at 786, 94 S.Ct. at 1308, 39 L.Ed.2d at 763 (22,000). A percentage figure will often better measure support, however, since in measuring the burden placed on a candidate by a nominating requirement, the size of the population from which potential petition signers, volunteers, and campaign staff are drawn, is critical.

That "laundry list" ballots discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion.

*Lubin v. Panish,* 415 U.S. at 715, 94 S.Ct. at 1319, 39 L.Ed.2d at 708.

On the other side of the balance sheet are interests fundamental to a democratic system. As Justice Black stated in *Williams v. Rhodes,*

> The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.

393 U.S. at 31, 89 S.Ct. at 10, 21 L.Ed.2d at 31.

The range of political views in our society cannot be compressed into the platforms of only two parties. Even where minor parties do not actually place candidates in office, their presence on the ballot provides disaffected voters with a means of protesting the status quo or of embracing unorthodox ideas. Developments in the Law-Elections, 88 Harv.L.Rev. 1111, 1123 (1975). The ballot box is our established means of effecting change, and excessive restrictions on it may redirect the pressure for change into other, less legitimate channels. While the 3% requirement imposes no direct limitation on the right to present a political philosophy or the right to associate and to solicit new members, if the state has effectively eliminated a political party's access to the ballot, it has deprived the party of much of the substance of the values meant to be insured by the rights of free speech and association. *See Williams v. Rhodes,* 393

U.S. at 41, 89 S.Ct. at 15, 21 L.Ed.2d at 37 (Harlan, J., concurring).

As we have noted, where such fundamental rights as freedom of speech and association are involved, only compelling government interests will justify their encroachment. *Mickens v. City of Kodiak,* 640 P.2d 818 (Alaska 1982); *Messerli v. State,* 626 P.2d 81 (Alaska 1981). An essential aspect of this test is an inquiry into whether less restrictive alternatives will adequately protect those interests. L. Tribe, American Constitutional Law § 13–20, at 781 (1978). That is, only a regulation which impinges on the right to speak and associate to the least degree possible consistent with the achievement of the state's legitimate goals will pass constitutional muster.[9] *Mickens v. City of Kodiak,* 640 P.2d 818, 822 (Alaska 1982).

Prior to 1980, Alaska had a petition requirement that the state concedes was adequate to prevent frivolous candidacies and to ensure that all candidates reaching the general ballot had "a significant modicum of support." The 1980 amendments were made to achieve uniform access barriers to the ballot and to eliminate the need for future amendments by adopting a percentage requirement. So far as we are aware both of these goals could have been achieved equally well by a signature requirement of, for example, 1% of voters as by the 3% requirement which was enacted.[10] By enacting a 3% requirement instead, the state increased the restrictions on ballot access. The state has not demonstrated that its first two goals justify such an increase. The state also claims, however, that it was concerned about voter confusion caused by the appearance of large numbers of candidates on the ballot. Yet the state failed to make any showing whatsoever that voter confusion has existed at any

---

9. We note that the United States Supreme Court has applied such a test in a ballot access case, but has not done so uniformly. *American Party of Texas v. White,* 415 U.S. 767, 780–81, 94 S.Ct. 1296, 1305–06, 39 L.Ed.2d 744, 760 (1974). *See McLain v. Meier,* 637 F.2d 1159, 1164 (8th Cir. 1980).

10. The former requirement of 1000 signatures amounted to somewhat less than 1% of the votes cast in 1978.

time.[11]  In the absence of such a showing, the state cannot contend that its action was correcting any abuse.  The 3% figure is not the least burdensome means of achieving the state's goals.[12]

Our conclusion finds support in *McLain v. Meier*, 637 F.2d 1159 (8th Cir. 1980), which involved a remarkably similar statute.  The signature requirement there amounted to 3.3%.  The court found that that barrier was excessive, noting the evidence in *Williams v. Rhodes*, 393 U.S. at 47 n.10, 89 S.Ct. at 19 n.10, 21 L.Ed.2d at 41 n.10, that 42 states have signature requirements of 1% or less.

We now turn to the question of relief.  We have found that AS 15.25.160 set up an impermissible bar to the ballot.  There exists no constitutional method by which a candidate who has minimally sufficient support may gain ballot access.  Under such circumstances

> a court may properly look to available evidence or to matters subject to judicial notice to determine whether there is reason to assume the requisite community support.

*McCarthy v. Briscoe*, 429 U.S. 1317, 1323, 97 S.Ct. 10, 13, 50 L.Ed.2d 49, 54 (1976, per Powell, J. as Circuit Justice).  There is justification for such an assumption on the record before us.

The AIP with Vogler as its gubernatorial candidate polled 4.8% of the total vote in 1974; in 1978, with Vogler as its candidate for Lieutenant Governor, it polled 1.9% of the vote.  The AIP remains an active organization, has periodic meetings, and publishes a newsletter.  It held a party convention in November 1981 at which Vogler was elected party chairman.  According to Vogler, the party has 3,000–4,000 members.[13]

For these reasons, we order the appellee to place the name of Joseph E. Vogler on the November 1982 general election ballot as the candidate of the Alaskan Independent Party for Governor of the State of Alaska.  Since candidates for governor must run jointly with a lieutenant governor candidate, the appellee is also directed to place the name of the nominee of the Alaskan Independent Party for lieutenant governor on the ballot, as selected pursuant to AS 15.25.130.[14]  The selection shall take place forthwith.

The remaining issue in this case is whether the definition of a political party contained in AS 15.60.010(6), upon which eligibility of the party to participate in a primary depends, AS 15.25.030, is constitutional.  This opinion has been issued on an expedited basis in view of the need to print ballots for the general election.  Since we have ordered affirmative relief based on the invalidity of AS 15.25.160, we will remove the present issue from the expedited calendar.  An opinion concerning it will follow in due course.

REVERSED.

CONNOR, J., and BURKE, C. J., dissenting.

CONNOR, Justice, with whom BURKE, Chief Justice, joins, dissenting.

I respectfully dissent.

---

11.  The greatest number of candidates that has appeared on the ballot occurred in 1978, when two independent candidates appeared, and a third staged a write-in campaign.  The state conceded at oral argument that five was not an excessive or confusing number of candidates.

12.  Similarly we note that Justice Harlan in his concurrence in *Williams v. Rhodes, supra,* seems to have found the absence of abuse under Ohio's old 1% requirement to be a ground for overturning the statute challenged there.  393 U.S. at 47 n.9, 89 S.Ct. at 19 n.9, 21 L.Ed.2d at 41 n.9.

13.  This is not refuted by the state;  however, the position taken by the state did not require refutation of this or of the other factual assertions made by appellants.

14.  AS 15.25.130 states, in part:
> *Selection of nominees for party petition.* The nominees of political parties by party petition may be selected for statewide offices by the party central committee or in any other manner prescribed by the party bylaws, and the petition for statewide offices shall be signed by the chairman of the central committee or in his absence by any two members of the committee....  The petition may be delivered in person, by mail or by telegraph.

In my view the three percent requirement for nomination by petition is valid. It is not an insuperable burden for a serious candidate to gather 4,880 or more signatures on a nominating petition.

Requirements for a percentage of signatures as large or larger have been upheld by other courts. See, e.g., *Jeness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Jackson v. Ogilvie,* 325 F.Supp. 864 (N.D.Ill.1971), affirmed 403 U.S. 925 (1971).

In my view, the determination of nominating petition requirements is a matter to be decided in the first instance by the legislature. It is only if we find such requirements to be unreasonable that we should strike down the quantum arrived at by the legislature. It seems entirely reasonable that the legislature should want to make all petition signature requirements for statewide office, which were previously quite different, a uniform three percent. I am unpersuaded that this requirement amounts to an invidious discrimination which requires our intervention.

Therefore, I would affirm the judgment of the superior court.