*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SUNNY GUERIN, ELIZABETH ASISAUN TOOVAK, and VERA LINCOLN, | ) ) ) |
| | ) Supreme Court No. S-18457 |
| | ) |
| | ) Superior Court No. 3AN-22-06795 CI |
| Appellants, | ) |
| | ) O P I N I O N |
| v. | ) |
| | ) No. 7648 – April 28, 2023 |
| STATE OF ALASKA, OFFICE OF LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS, and NANCY DAHLSTROM and CAROL BEECHER, in an official capacity, | ) ) ) ) ) |
| | ) |
| Appellees, | ) |
| | ) |
| and | ) |
| | ) |
| ALASKANS FOR NICK BEGICH, | ) |
| | ) |
| Intervenor. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Holly C. Wells, Mara E. Michaletz, and Zoe A. Danner, Birch Horton Bittner & Cherot, Anchorage, for Appellants. Katherine Demarest, Thomas Flynn, and Laura Fox, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees. Richard R. Moses and Stacey C. Stone, Holmes Weddle & Barcott, P.C., Anchorage, for Intervenor.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

HENDERSON, Justice.

## I. INTRODUCTION

Alaska's United States Representative Don Young died unexpectedly in March 2022. Following his death, Alaska held a special primary election and a special general election to select a candidate to complete the remainder of his term. Those special elections were conducted using ranked-choice voting procedures adopted by voters through a 2020 ballot measure. The ballot measure provides that the four candidates receiving the most votes in an open primary election advance to the ranked-choice general election.

After the 2022 special primary election but before the vote was certified, the candidate who then had the third-most votes withdrew. The Division of Elections (Division) determined that it would remove the withdrawn candidate's name from the special general election ballot, but would not include on the ballot the candidate who had received the fifth-most votes in the special primary election. Several voters brought suit against the Division challenging this decision. The superior court determined the Division's actions complied with the law and granted summary judgment in favor of the Division. The voters appeal.

Due to the time-sensitive nature of election appeals, we affirmed the superior court in a short order dated June 25, 2022. We now detail our reasoning in full.[1] Because the Division properly applied a statutorily mandated 64-day time limit that

---

[1] Under Appellate Rule 517 (b), when public officials who have been sued in their official capacity leave office, their successors are automatically substituted as parties to an appeal. Such changes are reflected in the caption of this decision.

prevented the addition of the special primary's fifth-place candidate to the special general election ballot, and because the statutory mandate did not violate the voters' constitutional rights, we affirm the superior court's grant of summary judgment in favor of the Division.

## II.    FACTS AND PROCEEDINGS

To provide context for our later discussion about the 2022 special elections, we briefly summarize the ballot measure that amended Alaska's election process. We then review the statutory framework governing special elections and candidate withdrawal, before discussing the facts underlying this appeal.

### A.    Ballot Measure 2

At the November 3, 2020 election, Alaska voters approved changes to the electoral process through "Alaska's Better Elections Initiative" (Ballot Measure 2).[2] In relevant part Ballot Measure 2 created an open primary election after which the top four candidates advance to a ranked-choice general election.[3]

#### 1.    Changes to primary elections

Prior to Ballot Measure 2, the Division oversaw primary elections for each political party.[4] To become a candidate for a party's primary election, a person must have been a member of the political party, or within the group permitted by the political party to run as a candidate in the primary, and must have submitted a declaration of

---

[2]      Ballot Measure No. 2, §§ 1-74, SLA 2020.

[3]      AS 15.15.350, .25.010.  We provided in-depth discussion of the changes to Alaska's election law in *Kohlhaas v. State*, 518 P.3d 1095, 1102-03 (Alaska 2022). Ballot Measure 2 also required greater disclosure of political funding sources, Ballot Measure No. 2, §§ 1, 9, 17, SLA 2020, which this opinion does not discuss because those provisions are not at issue here.

[4]      Former AS 15.25.010, .060 (2020) (amended Feb. 28, 2021).

candidacy.[5] Based on statutory guidelines, each party determined eligibility for voting in its primary election.[6] The candidate who received the most votes within each party's primary election advanced to the general election.[7] Additionally, an aspiring candidate who was not a member of a political party could be nominated by petition to appear on the general ballot.[8]

Following Ballot Measure 2, all candidates for an office run in one "nonpartisan open primary,"[9] regardless of their party affiliation or lack thereof.[10] The primary "does not serve to determine the nominee of a political party . . . but serves only to narrow the number of candidates whose names will appear on the ballot at the general election."[11] Any qualified voter may vote in this primary "without limitations based on

---

[5] Former AS 15.25.030 (2020) (amended Feb. 28, 2021) (requiring that the candidate be "registered to vote as a member of the political party whose nomination is being sought"). *But see State v. Alaska Democratic Party*, 426 P.3d 901, 909-15 (Alaska 2018) (holding the "party affiliation rule" violated the Alaska Constitution's free association guarantee where party had amended bylaws to permit registered independent voters to run as candidates in its primary elections).

[6] Former AS 15.25.010, .014, .060 (2020) (amended Feb. 28, 2021).

[7] Former AS 15.25.100 (2020) (repealed and reenacted Feb. 28, 2021).

[8] Former AS 15.25.140 *et seq.* (2020) (repealed Feb. 28, 2021). To qualify, a candidate needed to submit a petition with information about the candidate and collect and submit a requisite number of signatures from registered voters. Former AS 15.25.160-.180 (repealed Feb. 28, 2021). If successful, the candidate would be placed on the ballot. Former AS 15.25.190 (repealed Feb. 28, 2021).

[9] AS 15.15.025, .25.010.

[10] AS 15.15.025, .25.030(a)(5).

[11] AS 15.25.010.

the political party or political group affiliation of either the voter or the candidate."[12] Voters in the primary vote for only one candidate for each open position.[13] And for each position, the four candidates who receive the greatest number of votes in the primary advance to the general election.[14]

### 2. Changes to general elections

Prior to Ballot Measure 2, general election ballots displayed the names of primary election winners and the candidates nominated by petition.[15] Now "only the names of the four candidates receiving the greatest number of votes for an office" during the primary election will appear on the general election ballot.[16] Candidates who did not finish in the top four, or who were not candidates in the primary election, may file to run as write-in candidates.[17]

Previously, each voter selected one candidate per office and the candidate receiving the highest number of votes for the office was elected.[18] Under the new system, voters can still select one candidate per office, but they may also rank the candidates in order of preference.[19] The winner is then determined by tabulating those

---

[12]     *Id.*

[13]     *Id.*

[14]     AS 15.25.100(a).

[15]     Former AS 15.25.100 (2020) (repealed and reenacted Feb. 28, 2021); former AS 15.25.190 (repealed Feb. 28, 2021).

[16]     *Id.*

[17]     AS 15.25.105.

[18]     Former AS 15.15.450 (repealed and reenacted Feb. 28, 2021).

[19]     *See* AS 15.15.350(c), (d).

preferences in a series of rounds.[20]  The Division first must "tabulate each validly cast ballot as one vote" for the voter's top-ranked candidate.[21]  If, after this round, one candidate has over 50% of the votes, that candidate is elected.[22]  If not, the candidate with the fewest number of votes is eliminated, and each ballot that ranks the eliminated candidate first is counted for that ballot's second choice, if any.[23]  This process repeats until one candidate receives more than half of the active ballots, or only two candidates remain, and the candidate with more votes is elected.[24]

### 3.    Withdrawing from general elections

A candidate who receives enough votes in the primary election to advance to the general election ballot may withdraw before the election, but that candidate's replacement on or removal from the ballot is subject to statutory and regulatory restrictions.  If a qualifying candidate withdraws "after the primary election and 64 or more days before the general election, the vacancy shall be filled . . . by replacing the withdrawn candidate with the candidate who received the fifth most votes in the primary election."[25]  Otherwise, "the director shall place on the general election ballot only the

---

[20]    *See* AS 15.15.350-.360.

[21]    AS 15.15.350(d).

[22]    *Id.*

[23]    AS 15.15.350(d)(2).  Ballots that rank an eliminated candidate but do not rank a candidate in the next two lower ranking positions are moved to an inactive status if the ranked candidate is eliminated.  AS 15.15.350(f), (g)(2).

[24]    *Id.*

[25]    AS 15.25.100(c).

names of the four candidates receiving the greatest number of votes for an office."[26]  The Division has also adopted through regulation a 64-day replacement deadline for removing a candidate's name from the ballot.[27]

### 4.    Special elections

When a vacancy occurs in a federal congressional office, the governor must call a special election by proclamation.[28]  The special primary election must "be held on a date not less than 60, nor more than 90, days after the date the vacancy occurs."[29]  A special general election must then take place "on the first Tuesday that is not a state holiday occurring not less than 60 days after the special primary election."[30]

Though these provisions set forth certain processes and requirements

---

[26]    AS 15.25.100(a).

[27]    6 Alaska Administrative Code (AAC) 25.210(b) (2022).  This regulation was recently amended.  However, the 64-day withdrawal deadline was part of the prior version and did not change in the update.  *Compare* 6 AAC 25.210(b) (2022), *with* 6 AAC 25.210(b) (am. Feb. 28, 2014).

There is also a statutory and regulatory deadline for removing a candidate's name from the primary election ballot.  AS 15.25.055; 6 AAC 25.210(a). Alaska Statute 15.25.055 provides that "[a] candidate's name must appear on the primary election ballot unless notice of the withdrawal from the primary is received by the director at least 52 days before the date of the primary election."

[28]    AS 15.40.140.

[29]    *Id.*  The statute specifies alternative procedures for elections years "in which a candidate for that office is not regularly elected," *see id.*, but those provisions are not applicable here because 2022 was also a regular election year for the office of United States Representative.

[30]    AS 15.40.140. Ballot Measure 2 amended this provision, but the timeline requirements were present prior to its adoption.  *See* Ballot Measure 2, § 44, SLA 2020; former AS 15.40.142 (2020).

unique to special elections, special elections are largely governed by the same statutes that govern regular elections. Alaska Statute 15.40.220 explains that unless otherwise specified, "all provisions regarding the conduct of the primary election and general election shall govern the conduct of the special primary election" and special general election.[31] The statute also provides that the general election provisions applying to special elections include, among other specified provisions, those "provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities."[32]

## B. The 2022 Special Primary Election

When Representative Young died on March 18, 2022, the governor called a special election, including both a primary and a general election, to select a representative to serve the remainder of Representative Young's term.[33] This special election was Alaska's first ranked-choice voting election.

On March 22, the Division set and released "an initial, rough timeline of dates based on a June 11 special primary," noting that those dates were subject to change. The timeline set the candidacy filing deadline for April 1 (71 days prior to the special primary election) and the deadline to withdraw from the special primary election for April 4 (68 days before the special primary election). It set the "[t]arget certification date" for June 25. The Division also "administratively set a withdrawal deadline of Sunday, June 26 at noon, to allow candidates in the special primary election the chance

---

[31]    AS 15.40.220.

[32]    *Id*.

[33]    *See* AS 15.40.140; James Brooks & Nathaniel Herz, *Alaska plans unprecedented by–mail election in first step to replace Rep. Don Young*, ANCHORAGE DAILY NEWS, Mar. 22, 2022, https://www.adn.com/politics/2022/03/22/alaska-plans-unprecedented-by-mail-election-in-first-step-to-replace-rep-don-young/.

to remove their name from the general election ballot after the primary results are certified but before the general election ballots are finalized." This deadline was not released with the other dates in the timeline.

The special primary election was held on June 11. The Division certified the results on June 24, the same day this appeal was filed. The special general election was scheduled for August 16, the same day as the regularly scheduled 2022 primary election. Pursuant to AS 15.25.055, the withdrawal deadline for the regular primary election was June 25 — 52 days prior to that election.

On June 21 — 56 days before the special general election and the regular primary election — Dr. Al Gross filed his withdrawal from both elections. At that time, preliminary special election results indicated that Dr. Gross had the third most votes in the special primary election, followed by Mary Peltola with the fourth most votes and Tara Sweeney with the fifth most votes.

That same day the Division received a letter from legal counsel for Nick Begich, the candidate with the second most votes at the time. The letter argued that the Division should not advance Sweeney to the special general election ballot in place of Dr. Gross because it was not allowed under election laws. The Division responded by letter, explaining that it would not do so because AS 15.25.100(c) only permits the fifth place candidate to advance if a candidate withdraws 64 or more days before the general election.

Sunny Guerin, Elizabeth Asisaun Toovak, and Vera Lincoln (collectively Guerin) filed an emergency complaint in the superior court on June 23, challenging the Division's decision not to place Sweeney on the special general election ballot. Guerin argued that the Division's decision violated the statutes governing elections and "the well-established and fiercely protected fundamental right of the voters to select their political representatives." Alaskans for Nick Begich filed an unopposed motion to

intervene, which the superior court granted. Both Guerin and the Division filed motions for summary judgment. Following a hearing, the superior court tentatively upheld the Director's decision pending further motion work and oral argument. On June 24, after additional motion work was filed and oral argument was held, the court issued a final decision.

The court granted the Division's motion for summary judgment and denied Guerin's motion for summary judgment. Citing AS 15.40.220, the court concluded that the time window set by AS 15.25.100(c) for replacing a candidate in regular elections applies to special elections as well. Therefore, because Dr. Gross's withdrawal was outside that time window, the court determined that his withdrawal was too late for the Division to replace his name on the special general election ballot with the name of the candidate who received the fifth most votes.

Guerin immediately appealed, and in light of the upcoming election, we expedited our normal briefing process. On June 25, we issued a summary disposition order affirming the superior court's decision, and noted that an explanatory opinion would follow. This opinion explains our reasoning.

## III. STANDARDS OF REVIEW

We "review[] a grant of summary judgment de novo."[34] We will "uphold a grant of summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."[35] The parties agree that there are no genuine issues of material fact. Therefore, summary judgment is appropriate for either side, pending our review and statutory interpretation.

"We review an agency interpretation of statutory terms using one of two

---

[34] *DeNardo v. Mun. of Anchorage*, 105 P.3d 136, 139 (Alaska 2005).

[35] *Id.*

standards:  reasonable basis or independent judgment."[36]  If the interpretation "requires resolution of policy questions within the agency's area of expertise, the reasonable basis standard applies."[37]  If "the agency's specialized knowledge and experience are not particularly relevant to the issue at hand," as is the case here, "we substitute our own independent judgment."[38]  We will "adopt[] the 'rule of law that is most persuasive in light of precedent, reason, and policy.' "[39]

"Questions of constitutional . . . interpretation, including the constitutionality of a statute, are questions of law to which we apply our independent judgment."[40]

## IV.    DISCUSSION

### A.    The 64-Day Replacement Deadline Applies To Special Elections.

The main statutory disagreement between the parties is to what extent the provisions of AS 15.25.100(c) apply to special general elections.[41]  Though the text of

---

[36]    *PLC, LLC v. State*, 484 P.3d 572, 577 (Alaska 2021).

[37]    *Id.*

[38]    *Id. (quoting Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[39]    *Mat-Su Valley Med. Ctr., LLC v. Bolinder*, 427 P.3d 754, 762-63 (Alaska 2018) (quoting *State v. Ketchikan Gateway Borough*, 366 P.3d 86, 90 (Alaska 2016)).

[40]    *Ketchikan Gateway Borough*, 366 P.3d at 90.

[41]    AS 15.25.100(c) provides:

Except [when the candidate is a gubernatorial or lieutenant gubernatorial candidate], if a candidate nominated at the primary election dies, withdraws, resigns, becomes disqualified from holding office for which the candidate is nominated, or is certified as being incapacitated in the

(continued...)

AS 15.25.100 refers to a "general election" and does not reference special general elections, all parties agree that at least some provisions in AS 15.25.100(c) apply to special elections. The parties both cite AS 15.40.220 in support of this assertion.

Alaska Statute 15.40.220 indicates that "[u]nless specifically provided otherwise, all provisions regarding the conduct of the primary election and general election shall govern the conduct of the special primary election and special election of the . . . United States representative."[42] Both parties contend that "the provision pertaining to . . . candidate replacement" applies to special elections because no other provision governs the candidate replacement process.

The parties disagree, however, on whether the 64-day replacement deadline applies to special elections. The Division argues that AS 15.25.100(c) applies in full, including the 64-day replacement deadline applicable after a candidate's withdrawal. It argues that Title 15 does not otherwise specifically provide for the timing of a candidate's withdrawal and replacement on the ballot for special elections, and AS 15.40.220 thus directs the Division to apply the 64-day deadline. Guerin argues that statutory provisions setting out the timing of special elections conflict with the 64-day replacement deadline, and therefore the deadline does not apply.

When interpreting statutes, "we use a 'sliding-scale approach' to interpret the language. '[T]he plainer the statutory language is, the more convincing the evidence

---

[41] (...continued)
manner prescribed by this section after the primary election and 64 or more days before the general election, the vacancy shall be filled by the director by replacing the withdrawn candidate with the candidate who received the fifth most votes in the primary election.

[42] AS 15.40.220. Ballot Measure 2 slightly amended this statute to expressly include primary elections. Ballot Measure 2, § 49, SLA 2020.

of contrary legislative purpose or intent must be.' "[43]   If the language is "clear and unambiguous," then "the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent."[44]   And "[w]hen a statute . . . is part of a larger framework or regulatory scheme, [it] must be interpreted in light of the other portions of the regulatory whole."[45]

> **1.    The 64-day replacement deadline is among the type of provisions AS 15.40.220 contemplates applying to special elections.**

Alaska Statute 15.40.220 provides:

> Unless specifically provided otherwise, all provisions regarding the conduct of the primary election and general election shall govern the conduct of the special primary election and special election of the United States senator or United States representative, including provisions concerning voter qualifications; provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities; provision for notification of the election; provision for payment of election expenses; provisions regarding employees being allowed time from work to vote; provisions for the counting, reviewing, and

---

[43]    *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (footnote omitted) (first quoting *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012); and then quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)).

[44]    *Id.* (quoting *Fyfe*, 370 P.3d at 1095).

[45]    *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Com., Cmty. & Econ. Dev.*, 414 P.3d 630, 636 (Alaska 2018) (second and third alterations in original) (quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017)).

certification of returns; provisions for the determination of the votes and of recounts, contests, and appeal; and provision for absentee voting.[46]

The legislature has dictated that "[w]hen the words 'includes' or 'including' are used in a law, they shall be construed as though followed by the phrase 'but not limited to.' "[47] It has further instructed us that "[t]echnical words and phrases . . . shall be construed according to [their] peculiar and appropriate meaning."[48]

We interpret this expansive list of provisions, and the mandate that "all provisions" apply to special elections, to mean that the 64-day replacement deadline applies to special elections. To start, AS 15.25.100 certainly falls within the ambit of "all provisions," given the inclusive framing of the list and expansive characterization. Additionally, AS 15.25.100 is within the applicable provisions specifically enumerated in AS 15.40.220. The Division argues that "provisions regarding the duties, powers, rights, and obligations of the director, of other election officials, and of municipalities" include those listed in AS 15.25.100(a) and (c). We agree.

Though the word "duties" is not defined in the statute, it carries a particular legal significance, and we construe it according to its peculiar and appropriate meaning. Black's Law Dictionary defines duty as "[a] legal obligation that is owed or due to another and that needs to be satisfied; that which one is bound to do, and for which somebody else has a corresponding right."[49] Alaska Statutes 15.25.100(a) and (c) provide that "the director *shall* place on the general election ballot only the names of the

---

[46]    AS 15.40.220.

[47]    AS 01.10.040(b).

[48]    AS 01.10.040(a).

[49]    *Duty*, BLACK'S LAW DICTIONARY (11th ed. 2019).

-14-                                                                    **7648**

four candidates . . ." and that if a candidate withdraws "after the primary election and 64 or more days before the general election, the vacancy *shall* be filled by the director."[50] The use of "shall" makes these actions mandatory, not discretionary.[51] Thus, the director has a duty to follow the provisions in AS 15.25.100(a) and (c). This places AS 15.25.100's 64-day deadline directly within a "provision[] regarding the duties . . . of the director," and AS 15.40.220 subsequently makes any such provision applicable at a special election.[52]

Given that AS 15.25.100 is one of the sections that explicitly applies to special elections per AS 15.40.220 and is also implicitly included in the statute's expansive language, the remaining issue is whether Title 15 specifically provides some other withdrawal deadline for special elections.[53]

### 2. Statutory deadlines specific to special primary elections do not provide a different candidate replacement deadline.

Guerin argues that the 64-day replacement deadline in AS 15.25.100(c) cannot apply to special elections because AS 15.40.140 sets out specific timing for when special elections must occur once triggered. Guerin further asserts that because AS 15.40.140 contains *a* timeline, all general election time requirements are therefore inapplicable to special elections because they have been "specifically provided

---

[50] AS 15.25.100(a), (c) (emphasis added).

[51] *Fowler v. City of Anchorage*, 583 P.2d 817, 820 (Alaska 1978) ("Unless the context otherwise indicates, the use of the word 'shall' denotes a mandatory intent.").

[52] AS 15.40.220.

[53] *See id.* (stating that all general election statutes apply to special elections unless "specifically provided otherwise").

otherwise."[54] Guerin points to the Division's flexibility with certain other deadlines in the special election as further support.

We disagree with such a broad interpretation of the phrase "specifically provided otherwise." As it is possible to read AS 15.40.140 and AS 15.25.100(c) in harmony with one another, we reject Guerin's argument.

"When we engage in statutory construction, we must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole."[55] "Two potentially conflicting statutes . . . must be interpreted 'with a view toward reconciling conflict . . . .' "[56] But we will not rewrite statutes to reconcile them; "[t]he goal of reconciling conflict must thus give way when harmony between potentially conflicting provisions can be achieved only at the price of an interpretation at odds with statutory purpose."[57] We affirm that election "deadlines are mandatory, and therefore substantial compliance is not sufficient, absent substantial confusion or 'impossibility.' "[58]

---

[54]     AS 15.40.220. Guerin fails to point to any source, however, that would inform the Division of what deadlines it should use. This, conceivably, could mean that according to Guerin's theory the Division has complete discretion during special elections to set whatever deadlines it sees fit.

[55]     *State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007) (quotation omitted) (quoting *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999)).

[56]     *Allen v. Alaska Oil & Gas Conservation Comm'n*, 147 P.3d 664, 668 (Alaska 2006) (quoting *City of Anchorage v. Scavenius*, 539 P.2d 1169, 1174 (Alaska 1975)).

[57]     *Progressive Ins. Co. v. Simmons*, 953 P.2d 510, 517 (Alaska 1998).

[58]     *State v. Marshall*, 633 P.2d 227, 235 (Alaska 1981) (footnote omitted)
(continued...)

It is possible to apply and reconcile the mandatory deadlines in AS 15.25.100(c) with AS 15.40.140 without rewriting them or creating a meaning at odds with the statutory purpose. Alaska Statute 15.40.140 discusses one basic timeline: when a special primary election and subsequent special general election shall be held after a vacancy occurs. It does not make any mention of candidates withdrawing or the Division advancing candidates from the special primary to special general election. Alaska Statute 15.25.100(c) in turn provides for when a candidate can withdraw and be replaced. Nothing prevents the two statutes from working together seamlessly.

It is true that in some cases candidates may be unable to withdraw or be replaced after the special primary election.[59] But determining withdrawal and

---

**58** (...continued)
(quoting *Silides v. Thomas*, 559 P.2d 80, 86 (Alaska 1977)).

**59** Because the special general election must normally be held on the first non-holiday Tuesday 60 days or more after the special primary election, the normal range of time between the special primary and special general elections would be 60 to 66 days if no holiday is involved. The maximum range would increase to 73 days if a Tuesday holiday were involved. For example, if the 60th day after the special primary election was a Wednesday, and the following Tuesday was a holiday, then the range between primary and general election would be 73 days. In the unlikely event that the 60th day after the special primary election fell on Christmas Day on a Tuesday, the maximum range would be 74 days because New Year's Day, another holiday, would be on the following Tuesday.

Regardless of the number of days between the special primary and special general elections, nothing prevents the 64-day deadline from applying. If the special general election were held 60 to 63 days after the special primary election, then candidates would not be able to withdraw or be replaced between elections. If the special general election were held 64 or more days after the special primary election, the candidate would have a short window between elections to withdraw and be replaced. The statute clearly states that if a candidate withdraws *after* the special primary election *and* 64 or more days before the special general election, then that candidate can be
(continued...)

replacement requirements is the job of the legislature, and it is not our place to comment on policy decisions. The fact that replacement may not be possible in some circumstances does not mean that the 64-day replacement deadline is impossible to comply with, inherently inapplicable, or otherwise provided for. We interpret the statutes as written, and these statutes create requirements that sometimes will allow replacement and sometimes not.

We agree with the Division that "AS 15.40.140 provides no alternative to the 64-day replacement deadline in AS 15.25.100(c). And Guerin identifies no other source of a candidate replacement deadline." The clear language of AS 15.40.220 requires the general rules to apply "unless specifically provided otherwise." We do not see any other statute that *specifically* provides for a deadline other than the generally applicable 64-day deadline.

### 3. Ballot Measure 2 evinces the intent to apply the 64-day replacement deadline to special elections.

As discussed above, we apply a sliding-scale approach to statutory interpretation.[60] Interpreting statutes enacted pursuant to ballot measures requires a slightly different process than interpreting statutes passed by the legislature.[61] When construing a statute, we take "into account the plain meaning and purpose of the law as

---

[59]     (...continued)
replaced. The wording requires both criteria to be true, and it is not in our purview to address the wisdom of these requirements. They are clear, and nothing prevents their application.

[60]     *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019).

[61]     *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192-93 (Alaska 2007).

well as the intent of the drafters."[62]   Such a construction might include looking at statements by sponsors of the bill, for instance.[63]  But when reviewing a ballot measure, "we attempt to place ourselves in the position of the voters at the time the initiative was placed on the ballot, and we try to interpret the initiative using the tools available to the citizens of this state at that time."[64]  Thus, we will consider only "materials that Alaska voters had available and would have relied upon" when voting on the measure.[65]  To that end, we may consider "any published arguments made in support or opposition to determine what meaning voters may have attached to the initiative," but we refuse to "accord special weight to the stated intentions of any individual sponsor that are not reflected in the content of the legislation itself."[66]  Therefore, we "cannot rely on affidavits of the sponsors' intent" when determining the purpose of the ballot measure.[67]

The voters had access to the full text of Ballot Measure 2 when they approved it, and the statute as a whole provides context for its intent.  Other provisions of Ballot Measure 2 suggest that voters anticipated the 64-day replacement deadline would apply to special elections.  For example, the Division is directed by statute to prepare and publish an informational pamphlet for voters under certain circumstances.[68]

---

[62]     *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

[63]     *Kritz*, 170 P.3d at 193.

[64]     *Id*.

[65]     *Id.*

[66]     *Id.*

[67]     *Id.*

[68]     AS 15.58.010.  A pamphlet is only required in a special primary election if "a ballot proposition is scheduled to appear on the ballot."  The Division did not
(continued...)

Ballot Measure 2 provides that the pamphlet must notify voters of the 64-day replacement deadline by including the following statement:

> In each race, you may vote for any candidate listed. The four candidates who receive the most votes for a state office or United States senator will advance to the special election. *However, if, after the special primary election and 64 days or more before the special election*, one of the four candidates who received the most votes for a state office or United States senator at the primary election dies, withdraws, resigns, is disqualified, or is certified as incapacitated, the candidate who received the fifth most votes for the office will advance to the general election.[69]

Had the Division been required to prepare a pamphlet for this special election, it would have required this statement. Requiring this notification to voters during special primary elections evinces the intent of the drafters and the voters that adopted Ballot Measure 2 that the 64-day replacement deadline applies to special elections.[70]

---

[68]     (...continued)
prepare a pamphlet for this special primary election, nor was it required to. But the related statutory provisions, regarding the information to be published and provided to voters in a pamphlet, remains useful in discerning the intent of the drafters of Ballot Measure 2 and of the voters who approved it.

[69]     AS 15.58.020(c)(2) (emphasis added).

[70]     The statute does specify that it applies to elections "for a state office or United States senator" and fails to include a United States representative. AS 15.58.020(c)(2). The Division, citing AS 15.58.020(a)(13) and (c)(1), which use similar language but include "United States representative," argues that the omission of "representative" in AS 15.58.020(c)(2) was a "drafting error rather than an intentional choice." We agree that the omission of "United States representative" in AS 15.58.020(c)(2) was likely a drafting error. And although "[w]hen the legislature makes a drafting error, we do not rewrite the statute," AS 15.58.020(c)(2) remains

(continued...)

By contrast, Guerin points not to the language of the statute or information available to the voters, but rather draws support from an affidavit of one sponsor of the campaign reform measure that eventually became Ballot Measure 2. "But we will not accord special weight to the stated intentions of any individual sponsor that are not reflected in the content of the legislation itself."[71] The statements in the sponsor's affidavit do not reflect Ballot Measure 2's relevant statutory language and are not grounded in material that was available to the voters.[72] We cannot, therefore, derive Ballot Measure 2's intent from the sponsor's affidavit. Rather, we conclude that the language of the Ballot Measure itself anticipates application of AS 15.25.100's 64-day replacement deadline to special elections.

**B.     The Division Failed To Strictly Comply With Election Law Deadlines.**

Guerin argues that the Division's failure to abide by other statutory deadlines that are facially applicable to regular primary or regular general elections shows the Division has discretion in setting deadlines.

---

[70]     (...continued) indicative of the overall intent of Ballot Measure 2 as applied to special elections generally. *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1131 (Alaska 2017).

[71]     *Kritz*, 170 P.3d at 193.

[72]     For instance, the sponsor states in his affidavit that the "candidate-replacement deadline provided in Ballot Measure 2 for regular general elections was intended to harmonize with the candidate withdrawal deadlines . . . applicable to regular general elections as necessary to allow a fifth place candidate to be swapped in should any top four finisher withdraw before that deadline." The sponsor further states that the Division "is misapplying that deadline . . . in a manner that is completely contrary to the intent of Ballot Measure 2," stating that the measure "could not contain dates for every permutation or possible deadline that could arise as a result of a need for a special election." But none of these assertions were included in the language of Ballot Measure 2 or in the statements of support or opposition.

It is true that we give greater weight to an agency's interpretation of a statute when it is "longstanding and continuous."[73] However, this tenet merely directs us to "apply a more deferential standard of review."[74] It does not mandate a rejection of an agency's interpretation that shows inconsistencies over time or across similar statutes or regulations.

Though the parties did not raise the issue of Dr. Gross's name being removed from the special general election ballot, we are troubled by the Division's apparent failure to abide by the statute and its own regulations in this regard. Under our interpretation of AS 15.25.100, unless a candidate withdraws "after the primary election and 64 or more days before the general election," the Division "shall place on the general election ballot only the names of the four candidates receiving the greatest number of votes for an office."[75] This language makes clear that, had the Division strictly followed the law, Dr. Gross's name should have remained on the special general election ballot.

Similarly, under 6 AAC 25.210(b), the 64-day replacement deadline applies to *removing* a withdrawn candidate's name from the general election ballot.[76] Abiding by this regulation would have required the Division to leave Dr. Gross's name on the

---

[73]     *Alaska Jud. Council v. Kruse*, 331 P.3d 375, 381 (Alaska 2014); *see also Vail v. Coffman Eng'rs, Inc.*, 778 P.2d 211, 213 (Alaska 1989) ("Even under [the independent judgment] standard, we may give some weight to a longstanding and consistent administrative interpretation of the statute.").

[74]     *State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1216 n.67 (Alaska 2010).

[75]     AS 15.25.100.

[76]     That regulation states:  "The name of a candidate . . . will appear on the general election ballot . . . unless . . . the candidate's withdrawal . . . is received . . . not later than close of business on the 64th day before the . . . general election." 6 AAC 25.210(b) (2022).

ballot for the special general election. The Division acknowledged this regulation in a footnote, but argued that "[t]his deadline is not in statute, and including Dr. Gross on the ballot given his withdrawal would only confuse voters in this election and harm the public interest." Though the Division may be correct that including Dr. Gross's name would be confusing, such an assertion alone fails to justify deviation from an election statute or regulation.[77] Furthermore, the Division's assertion that the rule was "not in statute" is incorrect. Alaska Statute 15.25.100 provides unambiguous direction to the director on what names "shall" appear on the general election ballot.

We also note that, in setting the special primary withdrawal deadline of April 4, the Division may have violated the statutory withdrawal deadline for the special primary election. Alaska Statute 15.25.055 provides that "[a] candidate's name must appear on the primary election ballot unless notice of the withdrawal from the primary is received by the director at least 52 days before the date of the primary election." The Division set a withdrawal deadline of April 4, which was 69 days, not 52 days, prior to the special primary election.[78] However, as the parties did not raise or argue this point, we need not resolve it.[79]

We are concerned by the Division's inconsistency in applying the above election statutes and regulations. We remind the Division that election "deadlines are

---

[77]     *Cf. Vogler v. Miller*, 651 P.2d 1, 5-6 (Alaska 1982) (noting that in absence of evidence of voter confusion, increasing restrictions on ballot access to reduce voter confusion was improper).

[78]     One possible interpretation is that the statute establishes the minimum number of days to permit candidates to withdraw, while giving the Division discretion to set a longer deadline. We express no opinion on the validity of this interpretation.

[79]     *See Trs. for Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987) (describing "the principle that courts should not resolve abstract questions or issue advisory opinions").

mandatory, and therefore substantial compliance is not sufficient, absent substantial confusion or 'impossibility.' "[80] Unless the Division can articulate substantial confusion or impossibility, it must apply all statutorily mandated election deadlines as written in the statute.

With this said, the parties did not directly challenge the above inconsistencies in this matter. And contrary to Guerin's argument, the inconsistencies do not show that the Division has discretion nor do they justify selective application of the 64-day deadline outlined in AS 15.25.100(c). Failure to apply the law in one instance does not justify disregarding the law in another.

## C. The Decision Not To Put Sweeney's Name On The General Election Ballot Does Not Violate Guerin's Constitutional Rights.

As an initial matter, we note that one aspect of Guerin's statutory argument appears to undermine her constitutional challenge. Guerin argues that because the Division has some discretion to set the day for the special primary election,[81] it therefore also has the discretion to set other associated special election deadlines, and should, in this case, have set a different deadline so that the fifth place finisher could be substituted. As discussed above, we disagree that the Division had discretion to ignore the 64-day replacement deadline. But assuming Guerin's argument were correct, it necessarily then follows that Guerin believes the Division can set *a* replacement deadline. And if Guerin believes the Division can properly set a deadline, that also means Guerin believes a deadline, in and of itself, is not constitutionally barred.

---

[80] *State v. Marshall*, 633 P.2d 227, 235 (Alaska 1981) (footnote omitted) (quoting *Silides v. Thomas*, 559 P.2d 80, 86 (Alaska 1977)).

[81] AS 15.40.140 allows the Division to set the special primary election on a day "not less than 60, nor more than 90, days after the date the vacancy occurs." This gives the Division some discretion on the exact day the special primary election is held.

Guerin nevertheless argues that application of the 64-day deadline violated voters' rights to select their chosen candidate and that "[t]he gravity of the violation . . . triggers strict scrutiny" review. "Although voting is unquestionably a fundamental right, not every burden on the right to vote is subject to strict scrutiny."[82] And "the mere fact that a State's system 'creates barriers . . . tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny.' "[83] Rather, we turn to our three-part balancing test to assess the propriety of such a statute.[84]

When presented with a constitutional challenge to an election law, we "first determine whether the claimant has in fact asserted a constitutionally protected right."[85] If the claimant has done so, we apply "a flexible test" balancing three factors: "the character and magnitude of the asserted injury to the rights"; "the precise interests put forward by the State as justifications for the burden imposed by its rule"; and "the fit between the challenged legislation and the state's interests."[86] "[A]s the burden on constitutionally protected rights becomes more severe, the government interest must be more compelling and the fit between the challenged legislation and the state's interest

---

[82] *Sonneman v. State*, 969 P.2d 632, 637 (Alaska 1998).

[83] *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996) (alterations in original) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992)).

[84] *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1061 (Alaska 2005).

[85] *Id.* (quoting *O'Callaghan*, 914 P.2d at 1254).

[86] *Id.*

must be closer."[87]  When voters' and candidates' First and Fourteenth Amendment "rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' "[88]  However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."[89]

We recognize that Guerin has asserted a constitutionally protected right, as restrictions on ballot access implicate both rights of free association and the right to vote.[90]  As we have previously noted, "[r]estrictions on ballot access impinge not only on the rights of the potential candidates, but on those of the voters as well."[91]  The right to vote is integral to the functioning of our democracy:  "[t]he right of the citizen to cast [a] ballot and thus participate in the selection of those who control [the] government is one of the fundamental prerogatives of citizenship and should not be impaired or destroyed by strained statutory constructions."[92]

We now turn to the three-part balancing test, and first examine "the

---

[87]  *Id.*

[88]  *Sonneman v. State*, 969 P.2d 632, 638 (quoting *O'Callaghan*, 914 P.2d at 1254).

[89]  *Id.* (quoting *O'Callaghan*, 914 P.2d at 1254).

[90]  *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982) (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).

[91]  *Id.*

[92]  *Carr v. Thomas*, 586 P.2d 622, 626 (Alaska 1978) (quoting *Sanchez v. Bravo*, 251 S.W.2d 935, 938 (Tex. Civ. App. 1952)).

character and magnitude of the asserted injury to the rights."[93] We hold that the injury is not substantial in this instance.

In *Vogler v. Miller* we held that a statute requiring independent candidates and those from smaller political parties to submit petitions including a number of signatures equivalent "to 3% of the vote cast at the last election" unconstitutionally infringed on association and voting rights.[94] We emphasized that "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms."[95] And, pointing to federal ballot-access cases, we determined that "the state must show a compelling interest in order to justify infringements" upon ballot access.[96]

But the application of a 64-day withdrawal and replacement deadline is not analogous to the statute challenged in *Vogler*. In *Vogler* our concern about ballot access was rooted in the principle that "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes."[97] We were most concerned that "the state ha[d] effectively eliminated a political party's access to the ballot."[98]

---

[93] *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005) (quoting *O'Callaghan*, 914 P.2d at 1254).

[94] *Vogler*, 651 P.2d at 3. Candidates from political parties that had "polled 10% or more of the vote at the preceding gubernatorial election" only needed to file a declaration of candidacy and pay a filing fee. *Id.*

[95] *Id.* at 3.

[96] *Id.*

[97] *Id.* at 5 (quoting *Williams v. Rhodes*, 393 U.S. 23, 31 (1968)).

[98] *Id.*

There is a significant difference between restricting altogether a candidate's ability to run in an election and requiring a candidate to demonstrate some substantial support before advancing to the general election ballot, as the United States Supreme Court explained in *Munro v. Socialist Workers Party*.[99] In that case, the Court upheld Washington's blanket primary against a challenge by a candidate who did not advance to the general election ballot because he failed to obtain sufficient support during the primary election.[100] It reasoned that "[i]t can hardly be said that Washington's voters are denied freedom of association because they must channel their expressive activity into a campaign at the primary as opposed to the general election."[101] And "because Washington affords a minor-party candidate easy access to the primary election ballot," it determined that the "effect on constitutional rights is slight."[102]

Though "Alaska's constitution is more protective of rights and liberties than is the United States Constitution,"[103] we find *Munro* instructive given the similar facts and access-related arguments addressed in that case. Here, as in *Munro*, any qualified candidate may appear on the special primary election ballot provided the candidate files a timely declaration of candidacy.[104] This ease of access to the primary election ballot

---

[99]   479 U.S. 189, 197-99 (1986).

[100]   *Id.* at 192-93.

[101]   *Id.* at 199.

[102]   *Id.*

[103]   *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1060 (Alaska 2005).

[104]   AS 15.25.030.

entirely avoids the problems that concerned us in *Vogler*.[105] Guerin had a full opportunity to associate with and vote for the candidate of her choice. Therefore, any injury to her rights caused by the later application of the advancement or withdrawal process was slight, if it existed at all.

Furthermore, Guerin's particular objection is not to the broader structure of the primary system and advancement process, but to the specific application of the 64-day candidate replacement deadline in special elections. The withdrawal deadline imposes only a minute restriction on Guerin's associational rights and right to vote. It is a "reasonable, nondiscriminatory restriction" on constitutional rights.[106] It does not deny any particular party or person an "equal opportunity to win votes."[107] Instead, it restricts only the permissible timing for the replacement of a withdrawn candidate's name. The fifth-most vote-getter, after all, had an equal opportunity to gain as many votes as the top four, and failed to do so. The 64-day withdrawal deadline only impacts a fifth-place candidate and their associated voters if a candidate with more votes withdraws.

Having established that the injury to the rights asserted is slight, we now turn to the second and third factors in the analysis: the justification for the restriction and the fit between the restriction and the justification.[108] The State argues that any slight burden on constitutional rights is justified by "important regulatory interests in the orderly, timely performance of its duties to run elections." We agree.

---

[105] *Vogler v. Miller*, 651 P.2d 1, 5 (Alaska 1982).

[106] *Sonneman v. State*, 969 P.2d 632, 638 (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996)).

[107] *Vogler*, 651 P.2d at 5 (quoting *Williams v. Rhodes*, 393 U.S. 23, 31 (1968)).

[108] *Green Party of Alaska*, 118 P.3d at 1061.

As recognized in *Munro*, "the State's interest in preserving the integrity of the electoral process and in regulating the number of candidates on the ballot [is] compelling."[109] The *Munro* Court further reasoned that legislatures "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."[110] Though in some cases generalized interests such as avoiding ballot overcrowding and "holding orderly and efficient primary elections" may be "too abstract to justify a substantial restriction"[111] on associational rights, here these interests are sufficient to justify the minor restriction that AS 15.25.100 imposes.

We conclude that the Division's adherence to AS 15.25.100's 64-day replacement deadline posed no violation of Guerin's constitutional rights.

## V. CONCLUSION

Because the superior court correctly construed the relevant election statutes in applying the 64-day replacement deadline, and because adherence to the deadlines at issue did not violate Guerin's constitutional rights, we AFFIRM the superior court's decision granting summary judgment in favor of the Division.

---

[109]    479 U.S. 189, 194 (1986).

[110]    *Id.* at 195-96.  We adopted this reasoning in *Green Party of Alaska*, 118 P.3d at 1065-66.

[111]    *Green Party of Alaska*, 118 P.3d at 1066.