*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALASKA DEMOCRATIC PARTY and ANITA THORNE, | ) ) ) | Supreme Court No. S-19231 |
| Appellants, | ) ) | Superior Court No. 3AN-24-08665 CI |
| v. | ) ) | O P I N I O N |
| CAROL BEECHER, DIRECTOR, DIVISION OF ELECTIONS, in an official capacity; and STATE OF ALASKA, DIVISION OF ELECTIONS, | ) ) ) ) ) | No. 7776 – July 25, 2025 |
| Appellees, | ) ) | |
| and | ) ) | |
| ALASKA REPUBLICAN PARTY, | ) ) | |
| Intervenor-Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances: Thomas P. Amodio, Reeves Amodio LLC, Anchorage, and David R. Fox, Elias Law Group LLP, Washington, District of Columbia, for Appellants. Jessica M. Alloway, Thomas S. Flynn, and Katherine Demarest, Assistant Attorneys General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellees. Stacey C. Stone, Holmes Weddle & Barcott, P.C., Anchorage, and Richard R.

Moses, Holmes Weddle & Barcott, P.C., for Intervenor-Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.
CARNEY, Justice, dissenting.

## I.   INTRODUCTION

This case concerns a challenge to the Alaska Division of Elections' inclusion of Eric Hafner — a federal prisoner in New York — as one of the four candidates on the 2024 general election ballot for the United States House of Representatives. Hafner finished in sixth place during the open primary under ranked-choice voting, but the Division elevated him to appear on the general election ballot after two of the top-four primary candidates timely withdrew. The Alaska Democratic Party and Anita Thorne, a registered Democrat (collectively ADP), argue that Hafner cannot be elevated to the general election ballot because Alaska law allows a single replacement for a withdrawn candidate: the fifth-place candidate in the primary election. The superior court rejected ADP's claims for injunctive and declaratory relief. Due to the time-sensitive nature of election appeals, we affirmed the superior court in a short order dated September 12, 2024. We now explain our reasoning in full, holding that the laws establishing ranked-choice voting require successive replacements on the general election ballot if more than one top-four primary candidate timely withdraws and additional primary candidates are available as replacements.

## II.   FACTS AND PROCEEDINGS

### A.   Ballot Measure 2

In 2020 Alaskan voters established a system of ranked-choice voting through the "Alaska's Better Elections Initiative," more commonly referred to as Ballot

Measure 2.[1]  Prior to the enactment of Ballot Measure 2, the Division oversaw partisan primary elections for each political party.[2]  Under the prior system, the candidates who received the most votes for each political party advanced to the general election ballot.[3]  Candidates who were not affiliated with a political party could gain ballot access by gathering the requisite number of signatures on a nominating petition from registered voters.[4]  On the general election day, voters selected only one candidate; the winner was the candidate who received a plurality of the votes.

Ballot Measure 2 altered both the primary and general election processes. Following the enactment of Ballot Measure 2, all candidates, regardless of party affiliation, run in an open primary.[5]  Each voter chooses one candidate in the primary election;[6] the four candidates receiving the greatest number of votes then advance to the general election ballot.[7]  If after the primary election one of the top-four candidates "dies, withdraws, resigns, becomes disqualified[,] . . . or is certified as being incapacitated" and at least 64 days remain until the general election, pursuant to AS 15.25.100(c) the director of the Division is obligated to fill the vacancy by replacing

---

[1]     STATE OF ALASKA, DIV. OF ELECTIONS, OFFICIAL ELECTION PAMPHLET: REGION I 75-106 (2020) [hereinafter ELECTION PAMPHLET], https://www.elections. alaska.gov/election/2020/General/OEPBooks/2020%20AK%20Region%20I%20pamp hlet_FINAL-web.pdf; *see also Guerin v. State*, 537 P.3d 770, 773-76 (Alaska 2023) (summarizing Ballot Measure 2).

[2]     Former AS 15.25.010, .060 (2020) (amended Feb. 28, 2021).

[3]     Former AS 15.25.100 (2020) (repealed and reenacted Feb. 28, 2021).

[4]     Former AS 15.25.140-.200 (2020) (repealed Feb. 28, 2021).

[5]     AS 15.15.025.

[6]     AS 15.25.010.

[7]     AS 15.25.100(a).  Candidates who do not finish in the top four may run as write-in candidates in the general election, but their names do not appear on the ballot. AS 15.25.105.

the withdrawn candidate "with the candidate who received the fifth most votes in the primary election."

Ballot Measure 2 also altered the general election process. Rather than selecting one candidate, voters now rank up to four candidates in order of preference.[8] The winner is chosen through a series of vote-tabulation rounds. First, the Division "tabulate[s] each validly cast ballot as one vote" for the voter's top-ranked candidate.[9] If one candidate receives more than half of the votes, then that candidate is the winner.[10] If no candidate receives more than half of the votes, then the candidate with the fewest votes is defeated.[11] The votes cast for the defeated candidate are reallocated to the remaining candidates according to the voters' ranked preferences.[12] The process continues until one candidate receives more than half of the active ballots, or if only two candidates remain, the candidate with more votes wins.[13]

Ranked-choice voting was first implemented in the August 2022 special general election to replace former U.S. Representative Don Young and again in the

---

[8] *See* AS 15.15.350(c), (d); AS 15.15.030(17) (requiring director to instruct voters to "mark candidates in order of preference and to mark as many choices as the voter wishes").

[9] AS 15.15.350(d).

[10] *Id.*

[11] AS 15.15.350(d)(2).

[12] *Id.*

[13] *Id.* An active ballot is one that is still tabulated. An "inactive ballot" is no longer tabulated because it "does not rank any continuing candidate, contains an overvote at the highest continuing ranking, or contains two or more sequential skipped rankings before its highest continuing ranking." AS 15.15.350(g)(2).

November 2022 general election.[14]  Mary Peltola prevailed in both elections[15] and sought reelection to the U.S. House of Representatives in the November 2024 general election.

**B.     The 2024 Primary Election**

In May 2024 Eric Hafner filed a declaration of candidacy for Alaska's seat in the House of Representatives.  Hafner was incarcerated in federal prison in New York and was not scheduled for release until 2036.  Nonetheless, there were no challenges to his qualifications as a candidate in the primary election.

Alaska held its open primary election in August 2024 to determine which candidates would appear on the November general election ballot.  The top-four candidates were incumbent Peltola, a Democrat, and Republicans Nick Begich, Nancy Dahlstrom, and Matthew Salisbury, with the candidates receiving 50.9%, 26.7%, 19.9%, and 0.6% of the votes cast, respectively.  John Wayne Howe, a member of the Alaskan Independence Party, finished fifth, and Hafner, a Democrat, finished sixth, receiving 0.57% and 0.43% of the votes cast, respectively.

Dahlstrom withdrew from the general election on August 27 and Salisbury withdrew on August 30.  On September 2 — shortly after the deadline for a candidate to withdraw[16] — the Division updated its website to list both Howe and Hafner as candidates who would appear on the general election ballot in place of the two

---

[14]     STATE OF ALASKA, DIV. OF ELECTIONS, ELECTION INFORMATION, https://www.elections.alaska.gov/election-information/#GENR; *see also Guerin v. State*, 537 P.3d 770, 776-77 (Alaska 2023).

[15]     STATE OF ALASKA, 2022 SPECIAL GENERAL ELECTION: RCV TABULATION 2 (2022), https://www.elections.alaska.gov/results/22SSPG/RcvDetailed Report.pdf; STATE OF ALASKA, RCV DETAILED REPORT 3 (2022), https://www.elections.alaska.gov/results/22GENR/US%20REP.pdf.

[16]     AS 15.25.100(c) (imposing 64-day deadline to withdraw).

withdrawn candidates. Thus, the four general election candidates for U.S. Representative were Peltola, Begich, Howe, and Hafner.

Shortly thereafter, the Division finalized the general election ballot designs and sent them to the printer on September 5. And the next day, the Division began printing the ballots. State[17] and federal law[18] required the Division to mail ballots to uniformed, overseas, and certain remote Alaskan voters by September 20.[19]

## C.    Proceedings

ADP filed suit on September 4 seeking to enjoin the Division and its director from including Hafner on the ballot. The Alaska Republican Party intervened without opposition.[20] ADP moved for a temporary restraining order and preliminary injunction.[21] The superior court granted expedited consideration of the motion.

ADP argued it was likely to succeed on the merits, contending that in the event more than one of the top-four primary candidates withdraws, AS 15.25.100(c), as amended by Ballot Measure 2, permits the Division to elevate only a single candidate to the general election ballot, the one receiving the fifth most votes. Additionally, ADP maintained that Hafner was constitutionally ineligible to run as a candidate in Alaska because he was incarcerated in New York and unlikely to be released by election day. ADP argued that because Hafner was running as a registered Democrat it would suffer

---

**17**    *See* AS 15.20.081(k), (*l*) (requiring "the director [to] send an absentee ballot and other voting material" no later than 45 days before the election to an applicant that "expects to be living, working, or traveling in a remote area of the state where distance, terrain, or other natural conditions deny the voter reasonable access to a polling place at the time of the election").

**18**    *See* 52 U.S.C. § 20302(a)(8).

**19**    Because the statutory deadline was Saturday, September 21, ballots were required to be delivered to the post office on the prior business day. *See* 52 U.S.C. § 20302(a)(8); AS 15.20.081(k), (*l*).

**20**    *See* Alaska R. Civ. P. 24(a).

**21**    *See* Alaska R. Civ. P. 65.

irreparable harm both in the form of competitive damage to its chosen candidate, Peltola, and to its associational rights by suggesting that it was affiliated with a convicted felon, unless the Division was enjoined from including Hafner on the ballot.

The Division opposed the motion, arguing that the plaintiffs did not demonstrate a likelihood of success on the merits. In the Division's view, AS 15.25100(c) requires the director to replace successive vacancies created by candidates' timely withdrawals from the general election ballot, even if the Division elevates a candidate who finished behind the fifth-place primary candidate. It also argued that Hafner was qualified to appear on the ballot because the constitutional inhabitancy requirement applies only if and when a candidate is elected.

The superior court consolidated the hearing on the temporary restraining order and preliminary injunction with a trial on the merits and denied ADP's requested relief.[22] The superior court found that ADP did not demonstrate that it would suffer irreparable harm. In the court's view, the ranked-choice voting system "neutralizes" any harm to Peltola because voters may rank as many candidates as they prefer. Moreover, the court reasoned that ADP did not demonstrate associational harm because Hafner's designation as a registered Democrat did not indicate that the Democratic Party endorsed him. The superior court also sided with the Division on the merits. It found that Hafner was not constitutionally disqualified and that AS 15.25.100(c) required the Division to replace successive withdrawn candidates. Finally, the superior court also concluded, in the alternative, that dismissal was required because Hafner was an indispensable party under Alaska Civil Rule 19(a) and the litigation could not

---

[22]     *See* Alaska R. Civ. P. 65(a)(2) ("Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.").

proceed without his joinder.[23]   The court entered a final judgment on September 10 denying the requested relief.

ADP immediately appealed, arguing that the superior court erred in its interpretation of AS 15.25.100(c), denial of preliminary injunctive relief, and finding that Hafner was an indispensable party.[24]  We heard oral argument and announced our decision on September 12 — two days after the superior court's judgment.  We issued a written summary order that same day affirming the superior court and noting that this full opinion would follow.

## III.   STANDARD OF REVIEW

A party seeking injunctive relief must establish certain predicate elements, each of which is "subject to a particular standard or standards of review."[25]   "A [superior] court's legal conclusions about irreparable harm, adequate protection, and the probability of success on the merits of a claim may present pure questions of law based on undisputed facts or may involve mixed questions of fact and law."[26]   "[W]e review de novo the superior court's legal determinations in issuing the preliminary injunction."[27]   Where the facts underlying a superior court's legal conclusions are disputed, "the court must first make factual findings to establish the nature and extent

---

[23]   The superior court found that Hafner was a necessary party because "Hafner has an actual interest in the outcome of this case and he would be deprived of his interest without due process if the court granted the relief."  *See* Alaska R. Civ. P. 19(a).  Because we uphold the superior court's denial of ADP's claim for relief on the merits, we need not address the correctness of the superior court's indispensable party finding.

[24]   We do not further address the superior court's rejection of the claim of constitutional disqualification because ADP does not raise it on appeal.

[25]   *State v. Galvin*, 491 P.3d 325, 332 (Alaska 2021).

[26]   *Id.*

[27]   *Alsworth v. Seybert*, 323 P.3d 47, 54 (Alaska 2014); *Bridges v. Banner Health*, 201 P.3d 484, 489 (Alaska 2008).

of the harm."[28] We review factual findings for clear error, "reversing if, after reviewing the entire record, we are left with a firm and definite conviction that a mistake was made."[29]

## IV.   DISCUSSION

We agree with the superior court's interpretation of AS 15.25.100(c) and uphold the denial of declaratory and injunctive relief.[30] We hold that AS 15.25.100(c) requires successive replacements on the general election ballot if more than one top-four primary candidate timely withdraws. As long as additional primary candidates are available as replacements, the withdrawn candidates must be replaced by the remaining candidates with the next-highest vote share.

### A.   Alaska Statute 15.25.100(c) Requires The Division To Replace More Than One Timely Withdrawn Primary Candidate On The General Election Ballot.

When interpreting the language of a statute, "we use a 'sliding-scale approach' to interpret the language. '[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' "[31] "[W]e interpret [a] statute according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[32] But when reviewing a statute enacted pursuant to a ballot measure, "we attempt to place

---

[28]   *Galvin*, 491 P.3d at 332.

[29]   *Id.* (citing *Stephan P. v. Cecilia A.*, 464 P.3d 266, 271 (Alaska 2020)).

[30]   Because the superior court consolidated the hearing with a trial on the merits, we address the merits of ADP's claims for relief. *See Haggblom v. City of Dillingham*, 191 P.3d 991, 994-95 (Alaska 2008).

[31]   *Guerin v. State*, 537 P.3d 770, 778 (Alaska 2023) (quoting *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (footnote omitted)).

[32]   *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016) (quoting *State, Div. of Workers' Comp. v. Titan Enters., LLC*, 338 P.3d 316, 320 (Alaska 2014)).

ourselves in the position of the voters at the time the initiative was placed on the ballot, and we try to interpret the initiative using the tools available to the citizens of this state at that time."[33]  To interpret the ballot measure, "we will consider only 'materials that Alaska voters had available and would have relied upon' when voting on the measure."[34]  We look to these materials to discern the intent of the drafters and the voters who adopted the ballot measure.[35]  We may consider "any published arguments made in support or opposition to determine what meaning voters may have attached to the initiative."[36]

We begin our analysis with the text of AS 15.25.100(c).  We conclude that because the statute is susceptible to more than one reasonable interpretation, it is ambiguous.  Next, we review the language and purpose of Ballot Measure 2, which support an intention by the drafters and voters who adopted it to have four candidates appear on the ballot whenever possible.[37]  Finally, our precedent favors interpreting ambiguous statutes in favor of providing greater access to the ballot.  Under these circumstances we resolve the issue in favor of the Division's interpretation and affirm the judgment of the superior court.

1.  **The plain text of AS 15.25.100(c) is ambiguous.**

Resolution of this case turns on the meaning of AS 15.25.100(c).  In relevant part, the statute provides:

---

[33]  *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 193 (Alaska 2007).

[34]  *Guerin*, 537 P.3d at 780 (quoting *Kritz*, 170 P.3d at 193).

[35]  *Id.* at 781.

[36]  *Id.* at 780 (internal quotation marks omitted).

[37]  We use "Ballot Measure 2" when referring to the entire statutory scheme enacted by voter initiative.  We use individual statute sections when referring to specific provisions enacted by Ballot Measure 2.

> [I]f a candidate nominated at the primary election . . . withdraws . . . after the primary election and 64 or more days before the general election, the vacancy shall be filled by the director by replacing the withdrawn candidate with the candidate who received the fifth most votes in the primary election.[38]

The crux of ADP's argument on appeal is that the statute is clear: "Fifth means fifth." In its view, if one of the top-four primary candidates withdraws, AS 15.25.100(c) requires the director to replace the withdrawn candidate with — and *only* with — the "candidate who received the fifth most votes in the primary election."[39] And if two of the top-four candidates withdraw, ADP maintains that the Division can replace only one of the two vacancies with the fifth-place finisher; the other vacancy must remain unfilled because AS 15.25.100(c) authorizes only a single replacement candidate in the general election. It argues that had the drafters and the voters intended to create a mechanism for successive replacements, they would have instead referred to the candidate with "the next highest vote share" rather than "candidate who received the fifth most votes."

ADP's interpretation of AS 15.25.100(c) is reasonable. When read in isolation, the statutory phrase "candidate who received the fifth most votes" may suggest that only the original fifth-place candidate in the primary election is a permissible replacement for a withdrawn candidate. And a natural way to provide otherwise would be to refer to a replacement candidate in relational terms — such as the candidate with the "next highest vote share" — rather than by a static position — "candidate who received the fifth most votes." However, this is not the only reasonable interpretation of the statute.

---

[38]     AS 15.25.100(c).

[39]     *Id.*

When the text of AS 15.25.100(c) is read as a whole, ADP's argument is less persuasive. In the event of a vacancy, AS 15.25.100(c) imposes a mandate: "the vacancy shall be filled by the director," provided that at least 64 days remain until the general election.[40] ADP's interpretation is in tension with this mandate. How can the director fulfill this duty if more than one of the top-four candidates withdraws after the primary? Under ADP's reading, if there are two — or even three or four — withdrawals among the top-four candidates, the statute places a duty on the director without the means to fulfill that duty. ADP's response is that the statute addresses only a single vacancy. However, that conclusion requires us to infer a limitation into the statute, i.e., that the director's duty to replace a withdrawn candidate applies only to *one* withdrawn candidate. If the statute were unambiguous, we would not have to make this logical inference in order to accept ADP's interpretation.

Similarly, the Division's interpretation of AS 15.25.100(c) is also reasonable yet inconclusive. The statute requires the director to replace "a candidate" who withdraws.[41] As the superior court noted, the choice of "*a* candidate" rather than "*one* candidate" suggests that the director's duty applies without limitation to the number of vacancies that occur prior to the deadline. Further, AS 15.25.100(c) envisions multiple *causes* for vacancies,[42] so the replacement provision can reasonably be read to cover multiple vacancies, such as if one top-four candidate dies and another one withdraws.

Still, the Division's interpretation also requires us to read additional language into AS 15.25.100(c). The text of the statute allows the director to replace the

---

[40] *Id.*

[41] *Id.*

[42] *Id.* (requiring vacancy to be filled if candidate "dies, withdraws, resigns, becomes disqualified[,] . . . or is certified as being incapacitated").

vacancy with the "candidate who received the fifth most votes"[43] — not, as the Division would read it, the candidate who received the next-highest vote total in the primary. And if the provision was intended to require the director to replace multiple withdrawn candidates on the ballot, use of the plural "candidate*s*" rather than "a candidate" would have more clearly conveyed the extent of the director's duty. In sum, the Division's interpretation — that the phrase "candidate who received the fifth most votes in the primary election" is a relational position that is adjusted when a top-four candidate withdraws — is a reasonable interpretation. But it is not the only reasonable interpretation.

Our determination that AS 15.25.100(c) is ambiguous is supported by the Minnesota Supreme Court's interpretation of a similar candidate replacement provision in *Martin v. Dicklich*.[44] At issue in that case was whether Minnesota election law required the state to replace a political party's candidate for the Minnesota House of Representatives on the general election ballot following a candidate's timely withdrawal.[45] The parties advocated for opposing interpretations of the withdrawal provision: one would limit a party's ability to fill a vacancy to certain types of candidates, while the other would not.[46] The court determined that the withdrawal provision was ambiguous because it was susceptible to two reasonable interpretations.[47] Among other reasons, the court resolved the issue in favor of the plaintiffs because the

---

[43]  *Id.*

[44]  823 N.W.2d 336, 338 (Minn. 2012).

[45]  *Id.*

[46]  *Id.* at 344.

[47]  *Id.*

defendant's interpretation would require the court to read limiting language into the statute.[48]

Similarly, the ballot replacement provision at issue here requires us to imply additional limiting language to support *either* party's interpretation. If the meaning of AS 15.25.100(c) were unambiguous, we would not have to choose between two reasonable interpretations.

In an attempt to overcome the facial ambiguity in the statute, ADP argues that our decision in *Guerin v. State* is "inconsistent" with the superior court's conclusion that AS 15.25.100(c) requires four candidates to be placed on the ballot whenever possible. Our decision in *Guerin* is readily distinguishable. In *Guerin*, the main question before us was whether the replacement mechanism in AS 15.25.100(c) applies to special general elections.[49] We held that it does.[50] We also noted that the replacement provision "create[s] requirements that sometimes will allow replacement and sometimes not."[51] In that case, the statute unambiguously limited the Division's authority to replace the withdrawn candidate because the candidate withdrew when fewer than 64 days remained until the election.[52] Here, the candidates withdrew well before the 64-day deadline, so *Guerin* is inapplicable.

---

[48] *Id.* at 344-47 ("[R]espondents' interpretation would require that [the statute] be re-worded, by adding the underlined language, so that a vacancy in nomination occurs when 'a major political party candidate or nonpartisan candidate who was nominated at a primary dies or *a major political party candidate for a constitutional office* files an affidavit of withdrawal as provided in section 204B.12, subdivision 2a.' " (emphasis in original)).

[49] *Guerin v. State*, 537 P.3d 770, 777-81 (Alaska 2023).

[50] *Id.* at 781.

[51] *Id.* at 780.

[52] *Id.* at 776-77; AS 15.25.100(c) ("[I]f a candidate nominated at the primary election dies, withdraws, resigns . . . *64 or more days before the general election*, the vacancy shall be filled by the director . . . ." (emphasis added)).

To summarize, both parties' interpretations require us to imply additional language into the statute. Both interpretations are reasonable, but neither is clearly resolved by considering the plain text alone.[53] Therefore, we conclude that AS 15.25.100(c) is ambiguous, and we must look to the language and purpose of the statutory scheme enacted by Ballot Measure 2 to resolve the ambiguity.

### 2. The language and purpose of Ballot Measure 2 support an intention to have four candidates appear on the ballot whenever possible.

When interpreting statutory provisions enacted by ballot measure, "we will consider only 'materials that Alaska voters had available and would have relied upon' when voting on the measure . . . 'to determine what meaning voters may have attached to the initiative.' "[54] "The voters had access to the full text of Ballot Measure 2 when they approved it, and the statute as a whole provides context for its intent."[55] The ballot measure itself indicated that its purpose is "to improve the electoral process by increasing . . . choice."[56] It aimed to "generate more qualified and competitive candidates for elective office."[57] To achieve its stated purpose, Ballot Measure 2

---

[53]    *See, e.g.*, *Ray v. State*, 513 P.3d 1026, 1044 n.9 (Alaska 2022) (Carney, J., dissenting) ("If the statute is reasonably susceptible to more than one interpretation, then the statute is ambiguous . . . ."); *State v. Saathoff*, 29 P.3d 236, 240 (Alaska 2001) (holding statute was ambiguous because it was "susceptible to two different reasonable interpretations"); *Mun. of Anchorage v. Adamson*, 301 P.3d 569, 576 (Alaska 2013) (concluding statute was ambiguous because "either meaning is plausible"); *see also Dirt Road Dev. LLC v. Hirschman*, 7 N.W.3d 438, 444 (Neb. 2024) ("A statute is ambiguous if it is susceptible of more than one reasonable interpretation . . . .").

[54]    *Guerin*, 537 P.3d at 780 (quoting *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 193 (Alaska 2007)).

[55]    *Id.* at 781.

[56]    ELECTION PAMPHLET, *supra* note 1, at 79. The statement in support of Ballot Measure 2 noted, "Ranked-choice voting is a simple change that gives voters more freedom to choose the candidate that best reflects their positions." *Id.* at 105.

[57]    *Id.* at 80.

amended the then-existing partisan election system to one in which the "four candidates with the most votes in the primary election" would appear on the general election ballot.[58] It amended AS 15.25.100(a) and AS 15.25.010 which both refer to the "four candidates" receiving "the greatest number of votes."[59] Alaska Statute 15.25.010 also explicitly notes that the primary system "serves only to narrow the number of candidates whose names will appear on the ballot at the general election."[60] And in the very next sentence, the statute states, "[O]nly the four candidates who receive the greatest number of votes for any office shall advance to the general election."[61] The consistent references to *four* candidates suggest that voters would have understood that the ballot measure was intended to provide four candidate choices for each office on the general election ballot, provided that enough qualified candidates ran in the primary election.

ADP contends that the purpose of Ballot Measure 2 was to "filter the primary candidates so that only the most popular candidates advance to the general election." It provides scant support in the text or voter materials to back this claim. To the contrary, the language of the ballot measure made available to voters expressly states that its purpose was to *increase* candidate choice.[62] ADP's interpretation would contravene this purpose by limiting voters' choices when more than one of the top-four candidates drop out. Moreover, ADP's view of ranked-choice voting as "filtering" unpopular candidates is a more apt characterization of the previous electoral system.

Under the prior system, a candidate unaffiliated with a political party could appear on the general election ballot only by filing a petition with the requisite

---

[58]   *Id.* at 75.

[59]   AS 15.25.100(a); AS 15.25.010.

[60]   AS 15.25.010.

[61]   *Id.*

[62]   ELECTION PAMPHLET, *supra* note 1, at 79.

number of signatures.[63]  The purpose of the petition requirement was to require candidates to demonstrate a "significant modicum of support" to avoid cluttering the ballot and confusing voters.[64]  Ballot Measure 2 repealed the petition provision.  In place of the petition provision, it established the nonpartisan open primary election as the exclusive means for candidates to appear on the general election ballot.[65]  It requires the director to place the top-four candidates on the ballot regardless of how much support each candidate received in the primary.[66]  And even if ADP's interpretation were correct, allowing a single replacement candidate does not guarantee that the candidates appearing on the general election ballot have a threshold level of support.  The results of the 2024 primary highlight the flaw in ADP's argument:  the fourth and fifth candidates both received 0.6% or less of the vote — an amount of support that would have likely been insufficient for the candidates to qualify by petition under the prior regime.[67]

---

[63]      *See* former AS 15.25.160 (2020) (repealed Feb. 28, 2021); former AS 15.25.170 (2020) (repealed Feb. 28, 2021).

[64]      *Vogler v. Miller*, 651 P.2d 1, 4-6 (Alaska 1982); *see also State v. Metcalfe*, 110 P.3d 976, 980 (Alaska 2005).

[65]      *See* AS 15.25.100(a) ("[T]he director shall place on the general election ballot *only* the names of the four candidates receiving the greatest number of votes for an office." (emphasis added)).  Individuals may also file as a write-in candidate, but will not appear on the general election ballot.  *See* AS 15.25.105.

[66]      *See.* AS 15.25.100(a).

[67]      *See* former AS 15.25.160 (2020) (repealed Feb. 28, 2021) (requiring petitioning candidates for United States senator or representative to collect signatures of at least 1% of number of voters in preceding general election).  To qualify for ballot access under the old electoral system, petitioning candidates for U.S. representative would have needed to collect signatures from 1% of the 264,589 votes cast in the 2022 general election, or approximately 2,646 signatures.  *See* STATE OF ALASKA, RCV DETAILED REPORT 2 (2022), https://www.elections.alaska.gov/results/22GENR/US%20REP.pdf.  Assuming that a 2024 primary voter would have signed their chosen

Still, the language of the broader statutory scheme enacted by Ballot Measure 2 does not conclusively resolve the question. First, the election pamphlet materials did not explain or otherwise illuminate the replacement process to voters.[68] A reasonable voter could have understood the repeated references to the "top four candidates" as fixed positions at the time of the primary election, replaceable only by the fifth-place candidate. Second, the language in section 64 of Ballot Measure 2 appears to contradict the language of AS 15.25.100(c). Section 64, which amended AS 15.58.020(a), requires certain information to be printed on general election pamphlets.[69] One requirement obligates the Division to state that "if *one* of the four candidates . . . withdrew . . . 64 days or more before the general election, the candidate who received the fifth most votes for the office advanced to the general election."[70] By contrast, AS 15.25.100(c) refers to "*a* candidate" withdrawing.[71] The use of "one" as opposed to "a" candidate is more readily understood to indicate that the replacement provision applies only to a single withdrawal. But the drafters did not use the same language in AS 15.25.100(c) — the provision that actually governs the replacement procedure — so, at most, this contradiction further highlights the ambiguous character of the statute.

---

candidates' petition for ballot access under the old system, neither the fourth- nor the fifth-place candidates would have reached the signature threshold for ballot access, with each only receiving 652 and 621 votes, respectively. STATE OF ALASKA, 2024 PRIMARY ELECTION: ELECTION SUMMARY REPORT 1 (2024), https://www.elections. alaska.gov/results/24PRIM/ElectionSummaryReport.pdf. Though not a perfect comparison, this substantially undermines ADP's argument that ranked-choice voting was intended to filter out the unpopular "dregs of the candidate pool."

[68]      *See* ELECTION PAMPHLET, *supra* note 1, at 75-78.

[69]      *Id.* 100-01; AS 15.58.020(a).

[70]      AS 15.58.020(a)(13) (emphasis added).

[71]      AS 15.25.100(c).

Finally, ADP's interpretation of AS 15.25.100(c) would lead to questionable results.[72] First, suppose that the original fifth-place candidate withdraws, dies, or is incapacitated after the primary election. Thereafter, one of the top-four candidates withdraws. In this scenario, ADP's interpretation would prohibit the director from fulfilling her statutory duty to fill the vacancy because the original fifth-place candidate's unavailability preceded the vacancy, even if the sixth-place candidate is available as a ready replacement. Second, suppose that all of the top-four candidates withdraw. Under ADP's interpretation, the fifth-place candidate would be the de facto winner as the only permissible ballot replacement, facing no general ballot competition. In short, these hypotheticals demonstrate that ADP's view of a single replacement candidate leads to questionable results in application. We doubt that voters and the drafters would have intended such results.

### 3. Our precedent supports resolving the ambiguity in AS 15.25.100(c) in favor of greater ballot access.

In addition to the language and purpose of Ballot Measure 2, our precedent also supports interpreting AS 15.25.100(c) in favor of allowing multiple replacements. Restrictions on ballot access infringe on the constitutionally protected rights of not only candidates, but voters as well.[73] "The right to vote is integral to the functioning of our democracy: '[t]he right of the citizen to cast [a] ballot and thus participate in the selection of those who control [the] government is one of the fundamental prerogatives

---

[72] *See, e.g.*, *Martin v. Dicklich*, 823 N.W.2d 336, 346 (Minn. 2012) (finding that defendant's interpretation would lead to "an absurd result" because it would require withdrawn candidates for certain offices to remain on ballot while allowing replacements for others).

[73] *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982) (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)).

of citizenship and should not be impaired or destroyed by strained statutory constructions.' "[74]

Two of our prior decisions support resolution of ambiguous statutory provisions in favor of greater ballot access. First, in *O'Callaghan v. State*, we addressed whether a candidate who withdraws from one party's nomination is disqualified from appearing on the general election ballot as the candidate of another party.[75] We held that the candidate was not disqualified.[76] In *O'Callaghan*, a candidate for lieutenant governor won the Republican Party nomination.[77] Before the deadline, the candidate withdrew from the Republican ticket to fill a vacancy on the Alaska Independence Party's ticket.[78] The plaintiff argued that the candidate was "disqualified" under the statute from appearing on the general election ballot because he withdrew from the Republican nomination.[79] We determined that the withdrawal provision at issue in *O'Callaghan* was ambiguous.[80] Crucially, we resolved the question in favor of allowing the candidate to appear on the ballot because of "our clear policy favoring open access to the ballot" where the "election code does not clearly prohibit it."[81] This policy — along with a lack of clear legislative intent to the contrary — supported our

---

[74] *Guerin v. State*, 537 P.3d 770, 783-84 (Alaska 2023) (alterations in original) (quoting *Carr v. Thomas*, 586 P.2d 622, 626 (Alaska 1978)).

[75] 826 P.2d 1132, 1133 (Alaska 1992); former AS 15.25.110 (1989). AS 15.25.110 was repealed by Ballot Measure 2. That statute's language was substantially similar to the current AS 15.25.100(c) and addressed the procedure for a political party to fill a vacancy in its general election ticket.

[76] *O'Callaghan*, 826 P.2d at 1137.

[77] *Id.* at 1133.

[78] *Id.*

[79] *Id.* at 1135-36.

[80] *Id.* at 1135.

[81] *Id.* at 1137.

conclusion that a withdrawn candidate is only disqualified from appearing as a candidate of the *same* party that they withdrew from, not a wholly different political party.[82]

Second, in *Municipality of Anchorage v. Mjos*, we held that "[i]n cases where there is a statutory ambiguity as to whether or not a candidate is eligible to run for office, the statute should be construed in favor of eligibility" as long as the statute can be reasonably interpreted that way.[83] There, a candidate for the local assembly sought reelection; however, the municipal charter was ambiguous as to whether he was eligible.[84] Although established principles of statutory interpretation suggested the candidate was ineligible, we nevertheless concluded that because both interpretations were reasonable, our presumption in favor of ballot access compelled the "reasonably possible" interpretation that the candidate was eligible for reelection.[85] Courts in other jurisdictions have similarly applied a presumption of candidate eligibility when interpreting ambiguous statutes.[86]

---

[82] *Id.* at 1136-37.

[83] 179 P.3d 941, 943 (Alaska 2008); *see also id.* at 943 n.1 ("Statutes dealing with . . . the right of citizens to aspire to and hold public office, should receive a liberal construction in favor of assuring . . . the right to aspire to and hold public office.").

[84] *Id.* at 943-44. The provision at issue prohibited persons who have served "three consecutive *terms*" from serving in the local assembly until "one *full term* has intervened." *Id.* at 943 (emphasis added). The traditional rule against surplusage favored inclusion of both full and partial terms because the drafters used the modifier "full" when referring to intervening terms but not when referring to "three consecutive terms." *Id.* at 943-44. We noted that the canon does not apply in all circumstances. *Id.* at 944.

[85] *Id.* at 943.

[86] *See, e.g.*, *Bysiewicz v. Dinardo*, 6 A.3d 726, 738 (Conn. 2010) (holding that ambiguities in statutory limitations on eligibility to run for public office "should be resolved in favor of a candidate's eligibility"); *People ex rel. Dickerson v. Williamson*, 56 N.E. 1127, 1129 (Ill. 1900) (noting that ballot access laws should be liberally construed).

As discussed above, both parties' interpretations of AS 15.25.100(c) are reasonable.[87]  However, the language and purpose of Ballot Measure 2 favor the Division's interpretation:  allowing successive replacements aligns with the ballot measure's goal of furnishing greater candidate choices for voters.  And our clear precedent favoring ballot access compels our adoption of the Division's position.[88]  We hold that AS 15.25.100(c) requires the director to fill successive timely vacancies on the general election ballot if more than one top-four primary candidate timely withdraws and additional primary candidates are available.[89]

## V.  CONCLUSION

Based on the foregoing, the judgment of the superior court is AFFIRMED.

---

[87]    *See supra* Section IV.A.1.

[88]    *See* Richard L. Hasen, *The Democracy Canon*, 62 STAN. L. REV. 69, 78-79 (2009) (finding that Alaska caselaw demonstrates "particularly strong" preference for ballot access).

[89]    We hold only that the director must replace successive vacancies *provided that* the vacancies were timely and additional replacement candidates from the primary race remain.  If four or fewer candidates appeared on the primary ballot, then any subsequent vacancy on the general election ballot would remain unfilled.

CARNEY, Justice, dissenting.

Alaska Statute 15.25.100(c) states that

if a candidate nominated at the primary election . . . withdraws . . . after the primary election and 64 or more days before the general election, the vacancy shall be filled by the director by *replacing the withdrawn candidate with the candidate who received the fifth most votes in the primary election.*[1]

"Fifth" has a clear meaning — the one that comes after the fourth. And the statute fixes its application to "the candidate . . . in the primary election." The "candidate who received the fifth most votes in the primary election" therefore clearly means the candidate who received the next highest number of votes in the primary election after the candidate who received the fourth highest number. I fail to see "the facial ambiguity in the statute"[2] that the court identifies as the reason to undertake its circular journey through principles of statutory interpretation to arrive at its starting point of the ambiguity it posited. I respectfully dissent.[3]

Our longstanding approach to interpreting the meaning of a statute begins with the language. "[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[4] It is hard for me to imagine plainer language than this statute uses to describe the candidate who will fill a vacancy on the general election ballot.

---

[1]  Emphasis added.

[2]  Opinion at 14.

[3]  Because I believe the statute plainly requires reversing the superior court's decision, I see no need to address any of the other issues raised. Hafner is not an indispensable party because the statute forbids his being placed on the ballot; the specifics of his unorthodox candidacy do not matter.

[4]  *Guerin v. State*, 537 P.3d 770, 778 (Alaska 2023) (quoting *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019)).

Nothing about the text of AS 15.25.100(c) as a whole changes that plain meaning. Listing multiple causes that could lead a candidate whose name is on the ballot to withdraw is irrelevant.[5] The statute's acknowledgement that there are a number of reasons that a candidate might withdraw says nothing about its mandate that after a withdrawal "the candidate who received the fifth most votes in the primary election" shall fill the vacancy.

Nor do the history and purpose of Ballot Measure 2 undermine the statute's plain meaning. As the court observes, "[t]he ballot measure itself indicated that its purpose is 'to improve the electoral process by increasing . . . choice.' "[6] It did so.

No longer are primary elections separated by party or limited to those candidates who either were nominated by a major party or obtained sufficient signatures on a petition. Instead, all qualified individuals who wish to run for office are now listed on the primary election ballot.[7] After voters cast their individual votes for a single chosen candidate, the four candidates who received the most votes are listed on the general election ballot. By opening the figurative floodgates of primary elections for potential applicants, Ballot Measure 2 greatly increased Alaskans' choices for representation.

And the changes made to the general election increase Alaskans' choice further. No longer are Alaskan voters limited to the traditional single vote for a single candidate. Instead, Ballot Measure 2 introduced ranked choice voting — enabling each

---

[5]     Opinion at 13.

[6]     Opinion at 15 (second alteration in original).

[7]     The primary ballot in 2022 listed 22 candidates for Alaska's seat in the House; in 2024, it listed 12. *Sample Ballot – Primary Election*, DIV. OF ELECTIONS (Aug. 16, 2022), https://www.elections.alaska.gov/election/2022/prim/HD99.pdf; *HD1 Sample Ballot – Primary Election*, DIV. OF ELECTIONS (Aug. 20, 2024), https://www.elections.alaska.gov/election/2024/Primary/SampleBallots/HD1.pdf.

voter to cast as many votes as there are candidates by ranking each of them in order of preference.

In addition to these changes creating more choices for Alaskan voters, AS 15.25.100(c) increases choice a step further. In the event that a candidate who was among the top four vote recipients in the primary election withdraws, that vacancy can be filled by the candidate who received the fifth most votes in the primary election.

The court ignores this dramatic increase to voters' choices by focusing only on Ballot Measure 2's use of the number "four" in its description of the basic structure of the general election ballot and process.[8] The court then holds that despite this dramatically increased choice, the overall structure of the statutes creating our ranked choice voting process *requires* four candidates.[9] And as a result, it concludes allowing "fifth" its actual meaning in the statute would not further Ballot Measure 2's purpose.

Finally, the court asserts that our precedent supporting greater ballot access supports its decision and its interpretation of AS 15.25.100(c).[10] In doing so, the

---

[8] The court specifically lists the "title" of a new statutory section support. Op. at 16. Titles and headings "are not part of the law in Alaska," *Ketchikan Retail Liquor Dealers Ass'n v. State, Alcoholic Beverage Control Bd.*, 602 P.2d 434, 438 (Alaska 1979) *modified on other grounds*, 615 P.2d 1931 (Alaska 1980) and should be afforded little weight, if any, *see id.*; *DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 278 n.15 (Alaska 2003).

[9] This, of course, overlooks the reality that there have been many races on general ballots since the enactment of Ballot Measure 2 that have had fewer than four choices. *See, e.g.*, *HD3 Sample Ballot – General Election*, DIV. OF ELECTIONS (Nov. 8, 2022), https://www.elections.alaska.gov/election/2022/genr/HD3_JD1.pdf (one candidate in state senator race); *HD2 Sample Ballot – General Election*, DIV. OF ELECTIONS (Nov. 8, 2022), https://www.elections.alaska.gov/election/2022/genr/HD2_JD1.pdf (two candidates in state representative race).

[10] Opinion at 20-22.

court once again fails to acknowledge that Alaskans have already greatly increased ballot access by adopting Ballot Measure 2.

Because the plain meaning of "fifth" is clear and unambiguous, the lengths to which the court has reached to conclude otherwise are unnecessary and unreasonable. I therefore respectfully dissent.